IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

MAURICE MONSON,

          Plaintiff,

    v.

HEIDI STEWARD et al.,

          Defendants.

Civ. No. 2:15-cv-00513-PK

**OPINION & ORDER**

PAPAK, Magistrate Judge.

This *pro se* prisoner civil rights case comes before the Court on cross motions for summary judgment. ECF Nos. 78, 100, 129. For the reasons discussed below, Plaintiff's Motion for Summary Judgment, ECF No. 78, is DENIED and Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment, ECF Nos. 100, 129, are GRANTED.

# BACKGROUND

Plaintiff Maurice Monson ("Monson") is currently incarcerated at Two Rivers Correctional Institution ("TRCI"), an Oregon state prison located in Umatilla, Oregon. Am. Compl., ECF No. 31; Ans. to Am. Compl., ECF No. 43.

Defendants are employees of the Oregon Department of Corrections ("ODOC"): Defendant Heidi Steward ("Steward") is Assistant Director of Offender Management and Rehabilitation; Defendant Stuart Young ("Young") is Assistant Administrator of Religious Services; Defendant Dennis Holmes ("Holmes") is Administrator of Religious Services; Defendant Kelly Raths ("Raths") is Administrator of Inmate and Community Advocacy; Defendant Cherie Jackson ("Jackson") is an Office Specialist 2 in Religious Services; Defendant Don Hodney ("Hodney") is Chaplain at TRCI; Defendant John Myrick ("Myrick") is Superintendent at TRCI; Defendant Nancy Howton ("Howton") was Administrator of Offender Management and Rehabilitation until her retirement in April 2015; Defendant Michael Gower ("Gower") is Assistant Director of Operations and Acting Inspector General; Defendant Kim Brockamp ("Brockamp") is Deputy Director of ODOC; Defendant Steve Franke ("Franke") is Administrator of Eastside Institutions; and Defendant Collete Peters ("Peters") is Director of ODOC. Ans. to Am. Compl.

## I.  ODOC's Kosher Meal Policy

ODOC offers two dietary options to all inmates: the mainline meals and the non-meat alternative line. Young Decl. Ex. 4, at 1, ECF No. 104. The non-meat alternative is a vegetarian diet with optional dairy components and it complies with all Old Testament dietary requirements. Young Decl. Ex. 3, at 7; Fanger Decl., ECF No. 102.

ODOC's "practice and mission" is to "make every effort to accommodate inmates' religious beliefs." Young Decl. This includes providing diets designed to satisfy the requirements of an inmate's religion. Young Decl., Ex. 1, at 2. As part of this policy, ODOC provides kosher meals to inmates with sincere religious beliefs requiring a kosher diet. Young Decl.

A kosher diet adheres to the Jewish laws of kashrut, and is derived from the laws of the Bible (the "Written Torah") and from the rabbinic Oral Torah, which is preserved in the Talmud and related texts. Vincent Decl. Ex. 3, at 3 (Affidavit of Martin Jaffee), ECF No. 103.[1] The majority of kosher laws are not contained in the Old Testament, but were developed through the oral tradition and the Talmud. Vincent Decl. Ex. 3, at 6. ODOC's kosher diet was designed specifically for Jewish inmates who adhere to the laws of kashrut and was originally available only to Jewish inmates. Young Decl. Ex. 2, at 2. ODOC's kosher meals are produced in a factory, frozen, and then shipped to the institution where they are reheated in a microwave before being served to the inmate. Young Decl. Ex. 4, at 1.; Fanger Decl. The kosher meals do not contain meat, but do include soy products that are made to look and taste like meat.[2] Young Decl. Ex. 4, at 1.; Fanger Decl. ODOC kosher meals are served with a disposable tray, cup, and tableware. Young Decl. Ex. 3, at 4. The TRCI canteen also carries kosher items available for purchase by the inmates. Fanger Decl. Kosher canteen items are listed on the order form with a "K" to indicate their kosher status. Fanger Decl. Ex. 3.

---

[1] The Affidavit of Martin Jaffee, Professor of Jewish Studies and Comparative Religion at the University of Washington, was originally submitted as part of *McLenithan v. Williams*, Case No. 3:09-cv-085-AC, a separate action involving another ODOC inmate's claims related to the denial of a kosher diet. It is submitted here as Exhibit 3 of the Declaration of Shannon Vincent, ECF No. 103. Dr. Jaffee's Affidavit provides historical and religious context for the development of the kosher laws and their practical application.
[2] The kosher meals are not intended as a vegetarian diet. Although the kosher diet is currently meat-free, it could be revised to include meat, if that option proves more cost-effective. Fanger Decl.

In 2009, ODOC revised its kosher meal policy as part of a settlement agreement and began to consider requests for kosher meals from non-Jewish inmates, if the inmates have sincerely held religious beliefs that require a kosher diet and that belief can be sustained by an organized religion. Young Decl. Ex. 2, at 11; Ex. 3, at 1. Under a policy adopted in 2012, if an inmate requests a religious accommodation, the prison chaplain will give the inmate a form to fill out and will interview the inmate in order to better understand the request. Young Decl. Ex. 3, at 1-2, 9. The chaplain then forwards the request to the Religious Services central office, where a final decision on the accommodation is made. Young Decl.

If an inmate is approved for the kosher diet, the inmate may not eat non-kosher food from the kitchen or canteen. Young Decl. If an inmate violates this prohibition, he or she will be counseled by the chaplain and risks losing the right to continue receiving a kosher diet. Young Decl. Ex. 3, at 3.

The mainline and non-meat alternative meals cost $2.60 per inmate per day. Fanger Decl. It costs $6.75 per inmate per day to supply kosher meals, exclusive of the additional costs of maintaining kosher facilities and the additional staff time involved in preparation of the meals. Fanger Decl. It costs an extra $3,029.50 per biennium to supply an inmate with kosher meals. Fanger Decl. ODOC has investigated other means of providing kosher meals and determined that the current system is the most cost effective method of providing inmates with a kosher diet. Fanger Decl. Purchasing the prepackaged kosher meals in larger quantities would not yield a lower price. Fanger Decl. There are currently 58 inmates who receive kosher meals, costing ODOC $175,711 in additional expenditures per biennium, out of a total kitchen budget of $27,856,277 for the 2015-2017 biennium. Fanger Decl.

ODOC has investigated how many inmates would request a kosher diet if it were made more generally available. Vincent Decl. Ex. 2 (Declaration of Paul Bellatty).[3] Although the investigation did not yield a specific number, the results indicated that a substantial percentage of inmates would request kosher meals, with especially high interest indicated by Muslim and Seventh Day Adventist inmates. Vincent Decl. Ex. 2, at 6. ODOC's security budget is "strained," and budgetary limitations have already resulted in a reduction in the quality of programming available for inmates and the amount of protection ODOC is able to offer to inmates and staff. Morton Decl., ECF No. 101.

## II.    Maurice Monson

Monson describes himself as "a Rastafarian who is a biblical believer," or a "Rastafarian Judeo-Christian." Vincent Decl. Ex. 1, at 10-11. Monson does not identify as Jewish or Christian, but does "adhere to Jewish laws." Vincent Decl. Ex. 1, at 5-6, 10.

The "most observant" Rastafarians follow a dietary law called Ital, which encourages its followers to eat a vegan or vegetarian diet and to avoid chemically altered foods, coffee, and dairy products. Vincent Decl. Ex. 1, at 9-10. Unlike a kosher diet, Ital does not require rabbinical oversight. Young Decl.

Monson asserts that his practice of Rastafarianism does not include adhering to the requirements of an Ital diet. Vincent Decl. Ex. 1, at 9-10. Although Rastafarians do not ordinarily eat a kosher diet, Monson maintains that his sincerely held religious beliefs require him to eat kosher meals. Vincent Decl. Ex. 1, at 5-6, 9. In particular, Monson's religious beliefs require him to strictly avoid contact with pork and pork products. Vincent Decl. Ex. 1, at

---

[3] Paul Bellatty is the Administrator of ODOC's Research and Evaluation Unit. Dr. Bellatty submitted his Declaration concerning the methodology and results of ODOC's inquiry into inmate interest in a kosher diet as part of *McLenithan v. Williams*, Case No. 3:09-cv-085-AC. Given the factual and legal similarity between *McLenithan* and the present case, Dr. Bellatty's Declaration has been, like the Affidavit of Dr. Jaffee, submitted as an exhibit attached to the Declaration of Shannon Vincent.

12. Monson testified that he believes all utensils should be disposable and that anything that has come in contact with pork products must be destroyed. Vincent Decl. Ex. 1, at 8, 12. Monson testified that he was unaware of the highly processed nature of ODOC's kosher meals. Vincent Decl. Ex. 1, at 12.

On August 9, 2013, Monson first requested that he be provided with ODOC's kosher diet, which Monson contends is required by his religion. Young Decl. Ex. 5, at 3. In making his request, Monson identified his religion as Rastafarian. Young Decl. Ex. 5, at 3. Monson said that, in the alternative, he would accept a vegetarian or vegan diet without coffee or milk.[4] Young Decl. Ex. 5, at 4. Monson said that he was aware that the non-meat alternative diet met all Biblical dietary laws, but claimed that it caused him to lose weight, interfered with his blood pressure, and "enticed [him] to buy commissary that also disagree with [his] blood pressure." Young Decl. Ex. 5, at 4.

Monson's request was denied on September 5, 2013, "due to lack of factual evidence to support that a kosher diet is rooted in Rastafari faith tenets and because his canteen purchases did not conform to kosher requirements or standards." Young Decl.; Ex. 6, at 1. The letter of denial also noted that Monson's medical file did not support his claim that he required additional calories or a special diet for his blood pressure. Young Decl. Ex. 6, at 1. Monson was informed that, even if a legitimate health issue existed, ODOC's kosher meals did not meet the health or dietary requirements Monson described. Young Decl. Ex. 6, at 1. Monson was encouraged to

---

[4] Monson's original request seems to be based on the belief that ODOC's kosher diet would most closely follow the requirements of Ital: "Well for us the most observant Rastas follow a dietary law called Ital. Ital food is food which is completely natural (not canned) free of chemicals and preservatives. Most Rastas are either vegetarians or vegans. Coffee and milk are also rejected as unnatural. So if there is anything that could be done to meet these standards are well accepted." Young Decl. Ex. 5, at 4. ODOC's response informed Monson that the kosher meals were "highly processed" and that he would have better access to fresh fruits and vegetables by eating the non-meat alternative tray. Young Decl. Ex. 6, at 1.

use ODOC's non-meat alternative diet, which offered food most closely aligned to the requirements of a Rastafarian religious diet.[5]  Young Decl. Ex. 6, at 1.

On July 12, 2014, Monson once again requested a kosher diet.  Young Decl. Ex. 7, at 1. In this request, Monson identified himself as a "Rastafarian-Judeo-Christian," and cited his belief in the Old Testament of the Bible and the Quran.  Young Decl. Ex. 7, at 2.  In this request, Monson particularly objected to pork products and to eating food prepared in the same kitchen where pork products had been prepared.[6]  Young Decl. Ex. 7, at 3.  Monson claimed that ODOC's non-meat alternative meals did not meet Old Testament dietary standards because the same pots, pans, and cooking utensils were used to prepare the mainline and non-meat alternative meals.  Young Decl. Ex. 7, at 3.  ODOC's subsequent inquiry revealed that Monson attended two Muslim religious services and one Protestant Christian service.  Young Decl.  Monson's second request was denied on August 5, 2014, "due to lack of factual evidence from Rastafari religious leaders to support his request and his canteen purchases—which included pork rinds—did not conform to kosher requirements or standards."  Young Decl.  Monson's canteen purchases, which included a number of non-kosher items, were especially considered to demonstrate a lack of sincerity.  Young Decl. Ex. 8; Ex. 9.  Monson was informed that all cookware, kitchen utensils, and dining utensils were properly cleaned and sanitized for each meal to avoid cross-contamination with meat products.  Young Decl. Ex. 8.  Monson was once again encouraged to use the non-meat alternative diet.  Young Decl. Ex. 8.

---

[5] Monson has previously submitted the Affidavit of Jason Powlette, a Rastafarian High Priest, ECF No. 94-1.  On the subject of religious diets, Dr. Powlette stated "Rastas are mostly vegan.  Where in special circumstances a vegan diet is not available for the Rasta then a vegetarian diet will suffice."  This would seem to be consistent with ODOC's findings on the dietary laws of Rastafarianism.  Notably, Dr. Powlette does not state that a kosher diet is a tenet of Rastafarianism.

[6] In making his second request, Monson states that he has no "Extra-Biblical" dietary requirements and requires "just what's stated in the Bible: Leviticus/Deuteronomy."  Young Decl. Ex. 7, at 3.  This appears to disclaim interest in the kosher requirements of the Jewish oral tradition.

On October 7, 2014, Monson filed a grievance requesting a kosher diet. Young Decl. Ex. 10. ODOC reviewed the grievance and did not discover any evidence that a kosher diet is a tenet of the Rastafarian religious practice. Young Decl. Ex. 11. ODOC also noted that Monson's canteen purchases did not reflect a sincere religious belief requiring a kosher diet. Young Decl. Ex. 11. On November 10, 2014, ODOC denied the grievance. Young Decl. Ex. 11.

On December 7, 2014, Monson appealed the denial of his grievance, alleging that ODOC had not adequately researched his request. Young Decl. Ex. 12. Monson stated that he is a "Rastafarian Judeo-Christian who believes in and follows the Levitical and Deuteronomy laws of the Old Testament in the Bible." Young Decl. Ex. 12, at 1.

ODOC was unable to find any support for Monson's request in Rastafarian religious practice. Young Decl. On December 22, 2014, ODOC denied Monson's grievance appeal. Young Decl. Ex. 13. In its denial, ODOC requested that Monson provide documentation "showing consistency in embracing selectively the doctrines of three separate religious belief systems." Young Decl. Ex. 13, at 2. ODCO also informed Monson that they would be willing to revisit Monson's request if he could demonstrate "clean" commissary purchases for a few months and provide ODOC with evidence of the existence of a Rastafarian-Jewish-Christian belief system. Young Decl. Ex. 13, at 2.

On January 28, 2015, Monson filed a second grievance appeal asserting that he is a "12 Tribes of Israel Rastafarian" and that his father was born in the Rastafarian Bobo Shanti sect and that he required a diet that complied with the standards of Leviticus and Deuteronomy. Young Decl. Ex. 14. ODOC researched Monson's request and found no support for Monson's claim that either the Twelve Tribes of Israel Rastafarians or the Bobo Shanti Rastafarians required or encouraged a kosher diet prepared with rabbinic blessing or oversight, although ODOC found all

Rastafarian sources agreed on a vegetarian or vegan diet. Young Decl. Ex. 15, at 1. On March 9, 2015, Monson's second grievance appeal was denied and he was once again encouraged to use ODOC's non-meat alternative diet. Young Decl. Ex. 15, at 2.

Monson commenced this action on March 27, 2015. ECF No. 1. On January 8, 2016, ODOC placed Monson on a kosher diet during the pendency of this case. Suppl. Young Decl. ECF No. 130. ODOC has since determined that Monson will receive a kosher diet for the rest of his time in ODOC custody, unless he asks to be removed from the kosher diet or engages in behavior that would render him ineligible for the kosher diet under ODOC rules.[7] Suppl. Young Decl.

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011); Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one. . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citations omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d

---

[7] Monson agrees that he has been provided with a kosher diet, but now alleges that he has been denied a special Passover meal and that ODOC's kosher meals are of poor quality. Pl.'s Reply to Suppl. Mot. Summ. J., ECF No. 137. No claims related to Passover or the quality of ODOC's kosher meals have been alleged in the Amended Complaint and the Court declines to consider new claims at this late stage of the case.

1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the non-moving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004). A "mere disagreement or the bald assertion that a genuine issue of material fact exists" is not sufficient to preclude the grant of summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989). When the non-moving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary[.]" *LVRC Holdings, LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009) (quotation marks and citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

Monson brings claims against a number of ODOC employees for their alleged roles in denying him a kosher diet, which Monson claims violated his constitutional rights under the Free Exercise Clause of the First Amendment; the Equal Protection Clause of the Fourteenth Amendment; his right to be free from cruel and unusual punishment under the Eighth Amendment; and his statutory rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.[8] Monson seeks declaratory and injunctive relief, as well as monetary damages. Both parties have moved for summary judgment.

---

[8] The Amended Complaint alleges a violation of the Religious Freedom Restoration Act ("RFRA"). RFRA has been supplanted by RLUIPA. *See Cutter v. Wilkinson*, 544 U.S. 709, 714-16 (2005) (explaining the history of RFRA and

As a preliminary matter, Monson concedes that he cannot maintain claims against Defendants Peters, Franke, Brockamp, Gower, and Howton. Pl.'s Reply, ECF No. 111, at 3. The Court accepts Monson's concession and all claims against those Defendants are DISMISSED.

## I.  RLUIPA

Monson bring claims pursuant to the Religious Land Use and Institutionalized Persons Act, which provides in relevant part that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

42 U.S.C. § 2000cc-1(a).

### A.  Claims for Monetary Relief Barred

RLUIPA was enacted pursuant to the Spending Clause and the Ninth Circuit has recognized that, within the constitutional limitations of that clause, RLUIPA does not authorize suits for damages against an official in his or her individual capacity. *Woods v. Yordy*, 753 F.3d 899, 903-04 (9th Cir. 2014). "If an individual acts under color of state law to burden a plaintiff's rights to religious exercise, the plaintiff can sue [only] the government." *Id.* at 904. To the extent that Monson seeks monetary damages against Defendants in their individual capacities, those claims are barred.

Nor can Monson recover monetary damages against Defendants sued in their official capacities. The Supreme Court has held the sovereign immunity shields states from suits for

---

RLUIPA). In his Responses, Replies, and other pleadings, Monson appears to agree that his RFRA claims are better characterized as RLUIPA claims. *See, e.g.*, Pl.'s Reply to Suppl. Mot. Summ. J., ECF No. 137. Accordingly, the Court interprets Monson's RFRA claims as being brought pursuant to RLUIPA.

monetary damages brought under RLUIPA. *Sossamon v. Texas*, 563 U.S. 277, 280, 293 (2011).

For the purposes of sovereign immunity, courts "treat [a] suit against state officials in their

official capacities as a suit against the state." *Alvarez v. Hill*, 667 F.3d 1061, 1063 (9th Cir.

2012) (quotation marks and citation omitted). Accordingly, Monson's RLUIPA claims for

monetary damages against Defendants in their official capacities are barred by sovereign

immunity.

### B. RLUIPA's Safe Harbor Provision

Defendants contend that their decision to provide Monson with a kosher diet on a

permanent basis entitles them to the benefit of RLUIPA's "safe harbor" provision, which

provides that:

> A government may avoid the preemptive force of any provision of this chapter by
> changing the policy or practice that results in a substantial burden on religious
> exercise, by retaining the policy or practice and exempting the substantially
> burdened religious exercise, by providing exemptions from the policy or practice
> for applications that substantially burden religious exercise, or by any other means
> that eliminates the substantial burden.

42 U.S.C. § 2000cc-3(e).

There is little in the way of Ninth Circuit authority construing the safe harbor provision,

but district courts have generally construed it according to its plain meaning. *See, e.g., Forter v.*

*Geer*, 868 F. Supp.2d 1091, 1098-99 (D. Or. 2012), *aff'd* 536 F. App'x 724 (9th Cir. 2013); *see*

*also Bilal v. Lehman*, No. C04-2507 JLR, 2006 WL 3626808, at *4 (W.D. Wa. Dec. 8, 2006)

(institution's decision to provide a Muslim inmate with halal meals eliminated the substantial

burden on the inmate's religious exercise and mooted the inmate's RLUIPA claim).

In this case, ODOC has provided Monson with the requested kosher diet and will

continue to do so until Monson is either released from ODOC custody, requests to be removed

from the diet, or violates the rules for inmates receiving kosher diets. Suppl. Young. Decl.

Construing the safe harbor provision according to its plain meaning, ODOC has either provided Monson with an exemption from the policy or otherwise "eliminate[d] the substantial burden" to Monson's religious exercise. Monson's claims for injunctive and declaratory relief under RLUIPA are therefore moot and Defendants are entitled to summary judgment on those claims.

## II. Constitutional Claims

Monson brings claims for violation of the First, Eighth, and Fourteenth Amendments to the U.S. Constitution based on Defendants' decision to deny him kosher meals. Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). To maintain a claim under § 1983, "a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

### A. Mootness

Monson seeks injunctive relief requiring Defendants to provide him with a kosher diet, as well as declaratory relief stating that Defendants' decision to withhold a kosher diet was a violation of Monson's constitutional rights. Defendants contend that ODOC's decision to provide Monson with a kosher diet on a permanent basis renders these claims moot.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "The voluntary cessation of challenged conduct does not ordinarily render a case moot because dismissal for mootness would

permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emps. Int'l Union Local 1000*, 567 U.S. 298, 307 (2012). Nevertheless, "voluntary cessation can yield mootness if a 'stringent' standard is met: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior cannot be expected to recur.'" *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). "The party asserting mootness bears a 'heavy burden' in meeting this standard." *Id.*

In cases where a governmental entity has changed its policy, courts presume that the government is acting in good faith. *Rosebrock*, 745 F.3d at 971. This presumption does not free the agency from its burden of demonstrating mootness, especially when the voluntary cessation is based on a change of policy that is not reflected in changes to statutes, ordinances, or regulations. *Id.* at 971-72. Mootness is most likely when the policy change: (1) is "broad in scope and unequivocal in tone;" (2) "fully addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in the case;" (3) the case in question was the catalyst for the agency's adoption of the new policy; (4) the policy has been in place for a long time when the court considers a mootness argument; and (5) since the policy's implementation, the agency officials have not engaged in conduct similar to the conduct challenged by the plaintiff. *Id.* at 972 (internal quotation marks and citations omitted). Mootness is less likely to be found where the new policy "could be easily abandoned or altered in the future." *Id.* (quoting *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013)).

On this record, it appears that the policy permitting Monson to receive kosher meals is limited to Monson personally and was adopted in response to the filing of this case. The scope of the change in policy is not entirely clear from this record. Although the accommodation

permitting Monson to receive kosher meals has been in place since early 2016, the change otherwise lacks the indicia of permanence that would permit the Court to find mootness based on voluntary cessation. The Court therefore concludes that, although Defendants are presumed to have acted in good faith, they have not met their "heavy burden" on the issue of mootness.

### B. Cruel and Unusual Punishment

Monson contends that Defendants' decision to deny him a kosher diet constituted cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution. "The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment, but also from inhumane conditions of confinement." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). While conditions of confinement "may be, and often are, restrictive and harsh," they must not involve "the wanton and unnecessary infliction of pain." *Id.* (internal quotation marks and citation omitted). The Eighth Amendment also imposes duties on prison officials, who must provide all prisoners with the basic necessities of life, such as food, clothing, shelter, sanitation, medical care, and personal safety. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

To establish a violation of the Eighth Amendment, the prisoner must show that the officials acted with "deliberate indifference." *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citations omitted). To establish deliberate indifference, "[p]laintiffs must satisfy both the objective and subjective components of a two-part test." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002). First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer*, 511 U.S. at 384. The plaintiff must demonstrate that the defendants have deprived him of the "minimal civilized measure of life's necessities." *Hallett*, 296 F.3d at 744. (internal quotation marks and citation omitted).

If an objective deprivation is shown, a plaintiff must show that the officials subjectively acted with a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834. An official is liable for inhumane conditions of confinement only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837. A plaintiff "must show that the defendant officials had actual knowledge of the plaintiffs' basic human needs and deliberately refused to meet those needs." *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000).

The Ninth Circuit has observed that this is "not an easy test," and it requires that the officials' conduct constitute "unnecessary and wanton infliction of pain." *Hallett* 296 F.3d at 744-45 (internal quotation marks and citation omitted). "Mere negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

The denial of a kosher diet simply does not rise to the level of "unnecessary and wanton infliction of pain." *See McLenithan v. Williams*, Civil No. 3:09-cv-00085-AC, 2016 WL 1312314, at *8-9 (D. Or. April 4, 2016) (denial of kosher meals does not satisfy the objective prong of an Eighth Amendment violation). As in *McLenithan*, Monson's claim cannot meet the objective prong of the test for a violation of the Eighth Amendment. Accordingly, Defendants are entitled to summary judgment on this claim.

### C. Free Exercise of Religion

Monson contends that the decision to deny him a kosher diet violated his right to the free exercise of his religion. "Inmates retain the protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) (internal quotation marks and citation omitted). To

implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief," and not purely secular philosophical concerns. *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see also Shakur*, 514 F.3d at 884-85 (noting the Supreme Court's disapproval of the "centrality test" and finding that the "sincerity" test in *Malik* determines whether the Free Exercise Clause applies). The right to religious practice "is not limited to beliefs which are shared by all members of a religious sect." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715-16 (1981). The Supreme Court has held that the question of sincerity "is, of course, a question of fact." *United States v. Seeger*, 380 U.S. 163, 185 (1965).[9]

If the inmate makes his initial showing of a sincerely held religious belief, he must establish that the prison officials substantially burdened the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith. *Shakur*, 514 F.3d at 884-85. A substantial burden exists where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs[.]" *Thomas*, 450 U.S. at 718. Even where the pressure to modify behavior is indirect, "the infringement upon free exercise is nonetheless substantial." *Id.* If a plaintiff "establishes that his need for a kosher diet is a sincerely held religious belief, denial of the diet is a substantial burden to his religious practice." *White v. Linderman*, No. CV 11-8152-PCT-RCB (SPL), 2013 WL 4496364, at *6 (D. Ariz. Aug. 22, 2013) (citing *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 987 (9th Cir. 2008)).

---

[9] In *United States v. Seeger*, the Court was addressing the sincerity of religious belief in the context of conscientious objectors under the Universal Military Training and Service Act. 360 U.S. 163, 164 (1965). More recently, district courts within the Ninth Circuit have applied the reasoning put forth in *Seeger* to assess the sincerity of religious beliefs in the inmate context, as required by *Malik*. *See, e.g., Dean v. Corr. Corp. of Am.*, 108 F. Supp.3d 702, 711 (D. Ariz. 2014); *White v. Linderman*, No. CV 11-8152-PCT-RCB (SPL), 2013 WL 4496364, at *4 (D. Ariz. Aug. 22, 2013).

A regulation or policy that burdens the First Amendment right to free exercise may be upheld only if it is reasonably related to a legitimate penological interest. *Shakur*, 514 F.3d at 884; *Turner v. Safley*, 482 U.S. 78, 89 (1987). This determination requires analysis of four factors: (1) there must be a valid, rational connection between the regulation and the legitimate government interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact that accommodation of the right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives. *Turner* 482 U.S. at 89-91.

In the context of religious diets, "[i]nmates have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987). However, "[i]t is appropriate for prison authorities to deny a special diet if an inmate is not sincere in his religious beliefs." *Id.* "Scrutiny of a prisoner's sincerity is often essential in 'differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud.'" *Shilling v. Crawford*, No. 205CV-00889-PMP-GWF, 2007 WL 2790623, at *16 (D. Nev. Sept. 21, 2007) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)).

In this case, Defendants assert that Monson's request for a kosher diet was not based on a sincerely held religious belief and that his request was not rooted in religious belief. For the purposes of the Court's inquiry, it is irrelevant whether a kosher diet is a tenet of Rastafarianism or a common practice among Rastafarians. Rather, the inquiry focuses on whether Monson sincerely believes that such a diet is required by his religion. Although a prison is permitted to inquire into an inmate's sincerity when considering a religious accommodation, the weight of recent case law suggests that it is inappropriate for a court to grant summary judgment based on

a plaintiff's alleged lack of sincerity. *See, e.g., Dean v. Corr. Corp. of Am.*, 108 F. Supp.3d 702, 711 (D. Ariz. 2014) (finding that the defendants have raised material questions of fact regarding the plaintiff's sincerely held beliefs.); *Colvin v. Caruso*, 605 F.3d 282, 298 (6th Cir. 2010) (sincerity of an inmate's beliefs does not turn on an inmate's objective knowledge of his religion); *Johnson v. Nev. Bd. of Prison Comm'rs*, No. 3:11-cv-00487-HDM-VPC, 2013 WL 5428423, at *2-3 (D. Nev. Sept. 26, 2013) (although the defendants produced evidence that the plaintiff's beliefs were not sincerely held, the question "must ultimately be resolved by the trier of fact."); *White* 2013 WL 4496364, at *5 ("'backsliding' or non-observance of a religious practice is not sufficient to establish as a matter of law that [the plaintiff] is insincere in his religious beliefs."); *Monts v. Arpaio*, No. CV 10-0532-PHX-FJM (ECV), 2012 WL 160246, at *3 (D. Ariz. Jan. 19, 2012) (although the plaintiff presented a "weak" case for the sincerity of his religious belief, it still presented a question of fact); *Reiss v. Stansel*, No. CV 09-1760-PHX-RCB (ECV), 2011 WL 2111999, at *5-6 (D. Ariz. May 26, 2011) ("[c]redibility issues such as the sincerity of [a plaintiff's] religious belief are quintessential fact questions. As such they ordinarily should be reserved for the factfinder at trial, not for the court at summary judgment,") (internal quotation marks and citation omitted); *Shilling*, 2007 WL 2790623, at *16 ("Whether a belief is sincerely held is a question of fact, generally not appropriately decided in a motion for summary judgment.").

Although the Court agrees that the record gives some cause for doubt on Monson's religious sincerity, as well as his reasons for requesting a kosher diet, the Court cannot conclude as a matter of law that Monson's religious beliefs are not sincerely held. Nor is the Court prepared to conclude as a matter of law that Monson's request was not rooted in religious belief,

although the record does suggest that Monson may have initially requested the kosher diet for reasons that were not necessarily connected to his religious convictions.

The Court therefore turns to the application of the *Turner* factors. With regard to the first factor, prisons have a legitimate interest in the orderly and cost-effective administration of religious diets and there is a rational connection between that interest and ODOC's policy limiting the kosher diet to inmates with sincerely held religious convictions requiring kosher food. *See Shakur*, 514 F.3d at 885-86; *McLenithan*, 2016 WL 1312314, at *6. The Court concludes that this factor weighs in favor of Defendants.

The second *Turner* factor examines "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. The focus of this factor is not upon the specific religious practice in dispute, but rather whether the inmate has been "denied all means of religious expression." *Shakur*, 514 F.3d at 886. In this case, Plaintiff does not appear to allege that the practice of his Rastafarian faith has been burdened beyond ODOC's decision to deny him a kosher diet. It appears from the record that he is free to attend religious services, speak with spiritual advisors, and study Rastafarian religious literature. Young Decl. Ex. 8, at 1 (referencing Monson's attendance at religious services); Ex. 12, at 2 (Monson references a meeting with an elder of the Lion of Judah Society); Pl. Resp. Ex. F (identified as "Excerpts of Plaintiff's Religion/Beliefs from Rastafarianism book provided to him from Defendants (Hodney)."); Ex. G (identified as "(LOJ) Lion of Judah Doctrine and bylaws."), ECF No. 112-1. Although the focus of this factor is on other means of religious expression, the non-meat alternative diet complies with Biblical laws and satisfies the Rastafarian prohibitions regarding consumption of meat. On this record, the Court concludes that the second factor favors Defendants.

The third *Turner* factor examines the impact that accommodation of the right will have on guards, other inmates, and on the allocation of prison resources generally. *Turner*, 482 U.S. at 90. "When accommodation of the right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officers." *Id.* In this case, Defendants have submitted evidence that a significant number of inmates would request access to kosher meals, if they were made more generally available. Vincent Decl. Ex. 2. Defendants have also submitted evidence demonstrating that providing kosher diets is significantly more expensive than the mainline or meat-alternative diets and that kosher meals represent a significant portion of ODOC's kitchen budget, even with the limited number of inmates currently receiving kosher meals. Fanger Decl. The per-inmate cost of the kosher diet would not be reduced by purchasing larger quantities of the meals. Fanger Decl. ODOC's security budget is already strained and would be further burdened by a substantial number of additional inmates seeking kosher diets. Morton Decl. In *McLenithan*, the court confronted an essentially identical situation and concluded that the likely consequence of granting a non-Jewish inmate's request for a kosher diet would be a large number of other non-Jewish inmates requesting the same accommodation, with the attendant burden on the prison budget. *McLenithan*, 2016 WL 1312314, at *7. The *McLenithan* court concluded that the third *Turner* factor favored the prison. *Id.* The Court finds that reasoning persuasive and likewise concludes that the third factor favors Defendants.

The fourth *Turner* factor examines whether there is an "absence of ready alternatives" to the challenged policy that would accommodate the inmate at *de minimis* cost to the prison. *Turner*, 482 U.S. at 90-91; *Shakur*, 514 F.3d at 887. In this case, ODOC has examined a number of possible solutions to the challenge of providing kosher meals to inmates, including the

establishment of a dedicated kosher kitchen or purchasing kosher meals from the State of Washington. Fanger Decl. ODOC has determined that the current system is the most cost-effective, despite the burden that it places on the prison budget. Fanger Decl. By ensuring that the non-meat alternative diet complies with Biblical laws, ODOC has attempted to satisfy the needs of inmates whose religion requires them to follow a Biblically-based diet without incurring additional costs. Young Decl. The Court concludes that the fourth factor favors Defendants.

Having considered all four *Turner* factors, the Court concludes that Defendants are entitled to summary judgment on Monson's First Amendment claim.

### D. Equal Protection

Monson contends that the decision to deny him a kosher diet violated his right to equal protection under the law. The Equal Protection Clause requires states to treat all similarly situated people equally. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "This does not mean, however, that all prisoners must receive identical treatment and resources." *Hartmann v. Cal Dept. of Corr. and Rehab*, 707 F.3d 1114, 1123 (9th Cir. 2013). To prevail on an equal protection claim, a plaintiff must show "that the defendants acted with an intent or purpose to discriminate against [them] based upon membership in a protected class." *Id.* (internal quotation marks omitted). In assessing an equal protection claim based on a prisoner's religion, courts analyze the claim under the *Turner* factors. *Shakur*, 514 F.3d at 891. "The fact that Jewish inmates are provided a kosher diet is not alone sufficient to show an equal protection violation." *McLenithan*, 2016 WL 1312314, at *8.

In this case, the same *Turner* analysis that applied to Monson's free exercise claim will apply to his equal protection claim. Once again, all four factors favor Defendants. Furthermore, there is no evidence that Defendants acted with an intent or purpose to discriminate against

Monson based on his religion. Rather, Defendants investigated the dietary laws requirements of Rastafarianism and the sincerity of Monson's religious beliefs and, based on the results of their inquiry, determined that Monson did not require ODOC's kosher diet. Defendants are entitled to summary judgment on Monson's claim for violation of his equal protection rights.

### E. Qualified Immunity

Defendants assert that they are entitled to qualified immunity. An official is entitled to qualified immunity if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The right must have been clearly established at the time of the defendant's alleged misconduct, so that a reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne*, 526 U.S. 603, 615 (1999). Courts have discretion in deciding which prong to address first, depending on the circumstances of the case. *Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009).

Even if a right is clearly established, qualified immunity protects an official from reasonable mistakes about the legality of his actions. *Wilkins v. City of Oakland*, 350 F.3d 949, 954-55 (9th Cir. 2003). The official is still entitled to qualified immunity if the official "could have believed, 'reasonably but mistakenly . . . that his or her conduct did not violate a clearly established constitutional right.'" *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001)). "The protection of qualified immunity applies regardless of whether the government official's error is

a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."
*Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted). Qualified immunity is
meant to protect "all but the plainly incompetent or those who knowingly violate the law."
*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks and citation omitted).

Although the Court has already determined that Defendants are entitled to summary
judgment on Monson's constitutional claims, Defendants are also entitled to qualified immunity.
In the context of Monson's First Amendment claim, Defendants had an obligation to investigate
the sincerity of Monson's request and they were presented with evidence suggesting a lack of
religious sincerity. Monson gave inconsistent reasoning for his request, first objecting that the
non-meat alternative tray caused him to lose weight and experience high blood pressure; then
that the non-meat tray was contaminated with pork because the kitchen used the same utensils to
cook the mainline meals. Young Decl. Ex. 5, at 4; Ex. 7, at 3. Monson also gave varying
descriptions of his particular religion, initially identifying himself as a Rastafarian and requesting
a diet most closely consistent with the requirements of Ital and then later identifying himself as a
Rastafarian-Judeo-Christian and citing to the Quran in support of his request. Young Decl. Ex.
5, at 4; Ex. 7, at 1-2. Monson consistently identified the Bible as the source of his sincerely held
religious beliefs regarding food preparation, but failed to provide Defendants with a reasonable
explanation of why the non-meat alternative tray did not satisfy those requirements. A review of
Monson's canteen receipts revealed regular purchases of non-kosher items, which cast grave
doubts on his sincerity. Young Decl. Ex. 9.

In light of Monson's inconsistent statements regarding his religious beliefs, his
unsupported claim that he required a kosher diet for health reasons, and his regular purchase of
non-kosher items from the canteen, Defendants concluded that Monson's request was not based

on a sincerely held religious belief. If that conclusion was in error, as Monson contends, then Defendants' mistake was reasonable in light of the information available to them at the time. Defendants are entitled to qualified immunity as to Monson's First Amendment claim.

As to Monson's equal protection claim, it was not clearly established that a prison must provide kosher meals to non-Jewish inmates when there are legitimate penological reasons to deny the accommodation. *See McLenithan*, 2016 WL 1312314, at *8 (granting summary judgment in favor the prison on an equal protection claim brought by a Seventh Day Adventist inmate for denial of kosher meals). Furthermore, Defendants' research into the dietary laws of Rastafarians led them to conclude that kosher meals were not required by Monson's religion. There is no evidence to support Monson's claim that Defendants' conclusion was based on a discriminatory motive and, if Defendants' conclusion was incorrect, the mistake was reasonable based on the information available to Defendants at the time of their decision. Defendants are entitled to qualified immunity as to Monson's equal protection claim.

Finally, it is not clearly established that denial of a kosher diet could be considered "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. *See McLenithan*, 2016 WL 1312314, at *8-9 (rejecting an inmate's Eighth Amendment claim based on denial of a kosher diet). Defendants are entitled to qualified immunity as to Monson's Eighth Amendment claim.

## CONCLUSION

The Court accepts Plaintiff's concession and Plaintiff's claims against Defendants Peters, Franke, Brockamp, Gower, and Howton are DISMISSED. Plaintiff's Motion for Summary Judgment, ECF No. 78, is DENIED. Defendants' Motion for Summary Judgment, ECF No. 100, and Supplemental Motion for Summary Judgment, ECF No. 129, are GRANTED. This action is DISMISSED and a final judgment shall be entered.

It is so ORDERED and DATED this 6th day of July, 2017

Hon. Paul Papak
United States Magistrate Judge